In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-25-00243-CR
NO. 09-25-00244-CR
_____

JERRETT PAUL PROCTOR, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 356th District Court
Hardin County, Texas
Trial Cause Nos. 29159 and 29157

MEMORANDUM OPINION

In appellate cause number 09-25-00243-CR, Appellant Jerrett Paul Proctor ("Proctor") appeals his conviction for online solicitation of a minor in trial cause number 29159. In appellate cause number 09-25-00244-CR, Proctor appeals his conviction for child grooming in trial cause number 29157. We affirm.

1

Procedural Background

Proctor was indicted for five separate offenses against the same child, PF. The five cases[1] were tried together, and the jury returned a guilty verdict on two of the five offenses, online solicitation of a minor and child grooming. *See* Tex. Penal Code Ann. § 33.021 and § 15.032. At the time of the alleged offenses, PF[2] was sixteen years old and was Proctor's stepdaughter. Proctor pleaded not guilty. In May of 2025, a jury found Proctor guilty of online solicitation of a minor and child grooming. The jury was unable to reach a unanimous agreement for punishment. The trial court declared a mistrial as to punishment. In June of 2025, a second jury heard punishment evidence and sentenced Proctor to 20 years confinement for the online solicitation of a minor (which had a punishment range of 2-20 years) and 10 years confinement for child grooming (which had a punishment range of 2-10 years).

---

[1] The five cases were Trial Cause No. 29157 (Child Grooming), Trial Cause No. 29158 (Indecency with a Child), Trial Cause No. 29159 (Online Solicitation), Trial Cause No. 29160 (Sexual Assault of Child), and Trial Cause No. 29161 (Felony Assault of a Child). The jury found Proctor not guilty in cause numbers 29158, 29160, and 29161, and guilty in 29157 and 29159.

[2] We use initials to refer to the victim, other children who testified in the cases, and others when necessary to protect the privacy of the children or victim. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[.]"). Because the indictments in trial cause numbers 29159 and 29157 use the pseudonym "PF" for the victim, we will use the same pseudonym when referring to the victim.

The trial court entered a Judgment of Conviction in each case, with the sentences to run concurrently. Proctor filed a notice of appeal in both cases.

Issues on Appeal

In both of his appeals, Proctor raises the same three issues. In his first issue, Proctor argues that the trial court violated the Fourth Amendment of the United States Constitution, Article 1 § 9 of the Texas Constitution, and Texas law by admitting text messages that were extracted from a cellular telephone without a warrant, subpoena, or valid third-party consent. In his second issue, Proctor asserts that the trial court abused its discretion when it allowed the State to reopen its case after resting and present witnesses who had remained in the courtroom after invocation of the sequestration of witnesses as provided for in Texas Rule of Evidence 614 ("the Rule"). And in his third issue, Proctor alleges that the trial court abused its discretion in allowing the State to reopen and present testimony under the false assertion that the witnesses would be rebuttal witnesses, resulting in unfair prejudice to Proctor and denial of a fair trial.

Evidence and Testimony Presented at the Guilt/Innocence Stage of Trial

1. Testimony of Detective Ronnie Gerald Freeman Jr.

Ronnie Gerald Freeman Jr. testified that he has been in law enforcement for twenty-six years and is a digital forensic detective with the Beaumont Police Department. He collects, analyzes, and processes digital media, which includes cell

3

phones, computers, DVRs, NVRs, game consoles, and flash drives. Detective Freeman testified that information such as call logs, contacts, and messages, can be extracted from a cell phone.

Detective Freeman testified that the cell phone that was part of this investigation came into his custody in July of 2024. He testified that he did not have the passcode for the cell phone. Detective Freeman discussed Cellebrite and Graykey as two programs that can be used to extract cell phone information. He stated that his attempt to use Graykey to access information on the cell phone was unsuccessful and he attributed this to an error with the Graykey program. The only data he was able to extract from the phone was to retrieve the SIM card, which "pretty much provides . . . a phone number of the device[]" and that was by using Cellebrite.

2. Testimony of Detective Tomas Barboza

Tomas Barboza testified that he has been a detective for the Port Arthur Police Department for fifteen years. He has over 250 hours of cell phone forensics, which include "extracting, mapping, [and] being able to analyze data." Detective Barboza stated that the software program, Cellebrite, was not compatible with PF's phone. He attributed the incompatibility due to the length of time the phone had been in evidence, and because it had been in airplane mode, which was from January 2024 until March of 2025. Detective Barboza stated that during the time the phone was in

4

evidence and on airplane mode, the phone was not able to update and "keep up with" the Cellebrite software.

That said, Detective Barboza explained that he was able to manually extract data from the phone using a passcode provided by the person who had custody of the phone. By using the passcode to access the phone, he was "able to obtain the messages between the phone number of the owner of the phone and the person of interest." He was able to retrieve all messages between the two numbers from December 2023 to January 2024. Detective Barboza explained how he was able to retrieve the messages and then create a video showing those messages as follows:

> Q. What, if any, efforts did you undertake to preserve what you observed on that cell phone?
> A. I have a -- it's a camera viewer. It's something like a -- actually it's almost like this microphone here. It has a little arm over it. I can set it on my computer. And it sits on top of the phone, and it records what I'm doing on the phone itself. So I was able to take a few snapshot pictures, with that same camera, of the information in the phone and also make a video of all the text messages. I just took the time and just scrolled up, paused for a minute and let it try to record, focusing into that conversation.

The video was saved to a thumb drive. Detective Barboza identified the thumb drive, which he also referred to as a USB memory device, and he testified he had labeled it with his initials at the time it was created. Detective Barboza confirmed that the thumb drive which was marked as State's Exhibit #1 and reflects his initials "contain the screenshots from that cell phone that [he] testified about, as well as [the] video of the limited exchange of text messages that [he] just testified about[.]"

5

3. Testimony by KF

KF testified that she is the younger sister of PF, that Proctor is her stepfather and that her mother is Kristina Proctor ("Kristina"). KF stated that in January of 2024, she borrowed PF's cell phone, and when she had it she was "being nosey[]" and she found messages on PF's phone where PF had texted a friend about what she and Proctor were doing. According to KF, her stepsister, MP, was with KF at that time, and MP also saw the messages on PF's phone. After reading the messages on PF's phone, KF and MP confronted PF about the messages they had read on her phone. KF stated that PF admitted that the messages were true. KF testified that the three girls went to Kristina to tell her about what was happening.

Later, her stepfather, Proctor, came home, and KF recalls him saying that he and PF had a "different kind of relationship than just stepdaughter-daughter." KF remembered that Proctor said that he "would never do it to [KF] because [KF was] too ugly for it." KF recalled that Proctor and PF "would go out of the house a lot together without anyone else[]" and that Proctor bought PF lingerie as well as sex toys like a vibrator and dildo. KF confirmed that she also went to a forensic interview at the Garth House sometime later in January of 2024.

4. Testimony by MP

MP testified that PF and KF are her "stepsisters," that Proctor is her father and Kristina is her stepmother. MP explained that she and KF saw disturbing

6

communications on PF's cell phone when they had borrowed the phone. MP and KF talked to PF about the communications and then the three of them also spoke to Kristina about what they saw on PF's cell phone. MP testified that when the three girls talked to Kristina, she "did nothing." MP also testified that when Proctor came home, he sat on the bed and said he "never meant to harm [PF] and that . . . it was consensual." And MP recalled that Proctor also pointed at MP and told her not to tell her mother because he could go to prison.

MP testified that Proctor and PF's relationship was "[a]wfully close[]" and that "they would go places, and [MP] wasn't allowed to go with them." She recalled that Proctor bought PF "very sexual items and toys" and vapes.

MP testified that she told her mother, CA, and that her mother called the police. Two days after Proctor told MP not to tell anyone, Baleigh Hancock with CPS came to MP's school to talk to MP, and MP explained that she was not truthful with Baleigh Hancock because she was afraid that Proctor would go to prison. Later, when MP was interviewed at the Garth House, she told the interviewer what had really happened.

5. Testimony of Kristina Proctor

Kristina Proctor testified that she is Proctor's wife, PF and KF's mother and MP's stepmother. Kristina denied that PF, KF, and MP had talked to her about Proctor in January of 2024. She denied that any of them "came to [her] about text

7

messages[]" or that any of them came to her "about a concern that arose from looking at PF's phone about an inappropriate relationship with [Proctor]." Kristina denied that PF came to her and discussed "a relationship of a sexual nature with [Proctor]." She testified that KF and MP would be lying if they had testified that Proctor had stated what happened between him and PF was "consensual" or if they said that Proctor had told them not to tell anyone because he would go to jail.

Kristina testified that she had given the cell phone that PF used to PF and that she monitored PF's use of the phone. Kristina told the jury she did not see or view any text messages between PF and Proctor when she would monitor PF's phone. Kristina stated that to her knowledge Proctor had never sent PF any text messages. Kristina testified that she paid bills and received the electronic bills each month that were associated with PF's phone. Kristina also stated that she did not give consent for the phone to be "look[ed] through."

6. Testimony of PF

PF testified that at the time in question on weekdays, she lived with her grandmother in Vidor, Texas, where she was attending school, and on the weekends, she would go to her mother's house in Kountze, Texas. PF testified that Proctor is her stepfather and he lived in the house in Kountze with her "mother, stepsister, and younger sister." PF's cell phone was a red Apple iPhone 12 Mini. PF testified that she and Proctor would text each other several times a week during late 2023.

8

PF identified State's Exhibit #1, the flash drive that contained text messages and a video. Proctor's attorney objected to the exhibit, arguing it could not be properly authenticated. The trial court overruled the objection, and it was admitted into evidence. Proctor's legal counsel argued that there was no way to authenticate the messages because the investigator "couldn't download the phone itself, and so we don't have any way to authenticate -- without the cell phone records, we don't have any way to authenticate." The trial court overruled the objection and indicated that PF could authenticate the text messages as they were offered.

The State's attorney had PF look at screenshots from her phone that were downloaded onto the flash drive, and after identifying the persons by photographs, names and phone numbers, PF confirmed that the screenshots were from her phone. As PF was questioned regarding specific text messages, she confirmed that the messages came from her phone and that the messages were between herself and Proctor.

In explaining certain text messages, PF testified that Proctor sometimes referred to PF as "Boo[,]" "Pabby[,]" "PaBae[,]" and "[W]ifey[.]" PF explained the messages to the jury, which included among other things texts where Proctor said PF has "pretty ass eyes," texts where Proctor would talk to PF about getting her a pedicure, where Proctor stated he wanted to "make [PF] feel like a million bucks[,]" where Proctor stated he was the "only man [PF will] ever need[,]" and texts where

9

Proctor said he wanted to "do [her] hood[]" which PF explained meant that Proctor was asking if she wanted to have her clitoris pierced. Other messages included messages from Proctor about buying PF a lot of undergarments such as bras and panties from Victoria's Secret, and texts from Proctor asking if PF wanted to wear stockings, and references to filming, recording, and a photo shoot. There were multiple texts regarding an upcoming weekend and inquiries from Proctor about whether PF was "still 100 percent game[]" or if she was "getting cold feet." Some texts also had various emojis and PF explained the emojis. PF testified that Proctor asked about her menstrual cycle, and the texts included asking if her "period[]" had started to whether or not her "S-H-I-T is broke[,]" if her periods were "consistent" and "whether or not [PF had] skipped any months at a time or just weeks." PF responded and informed Proctor that she had "just started[]" her period, then Proctor responded with skull emojis and texted "[b]ut, honestly, that's the best and safest time" and that "[i]t [didn't] bother [Proctor] one bit, just can't do other stuff[,]" and that "[m]ost boys are just grossed out and won't." PF also explained that it was "probable[]" that based on her communications with Proctor that he may have thought she was pregnant. PF explained that the emojis and one text meant Proctor wanted "[PF] to shave [her] vagina before the weekend." PF testified that in addition to lingerie, Proctor also purchased other things for her such as vapes with marijuana cartridges, a vibrator, and a dildo. One message from Proctor asked if PF wanted to

10

take a break from her little sister and go with Proctor to his camper. PF testified that her response to that message was as long as there was "[n]o funny business." There were several messages where Proctor told PF she should be deleting their texts. Some texts from Proctor suggested using other platforms such as Discord and Pinterest to communicate.

PF confirmed that in January of 2024, PF's younger sister, KF, and stepsister, MP, saw some text messages on her phone. The text messages they saw on her phone were between PF and a friend, and PF was telling her friend about what was happening between PF and Proctor. PF testified that after KF and MP questioned PF about the messages, PF admitted to KF and MP what was happening between PF and Proctor. The girls agreed that PF should tell PF's mother Kristina about it.

On cross-examination, Proctor's defense attorney asked PF if she was "tech savvy[]" and knew how to delete things from text messages as follows:

> Q. That's about it. Okay. And so you knew how to -- and it's pretty clear, from whatever these messages are, that you were able to go through and individually delete certain things. Is that correct?
> A. Right.
> Q. And you could add -- essentially, add and delete stuff from the messages.
> A. You can't add.
> Q. Okay. But you were able to selectively delete stuff. Correct?
> A. Yes.

11

On redirect, the State's attorney had PF explain further about the information she had deleted which she testified had to do with texts she had received from Proctor after they had an intimate sexual encounter, and she testified as follows:

Q. And that was one of those days, just to be clear, that the Defendant inserted his penis into your vagina.
A. Yes.
Q. And after that was done, then did you get – what happened afterwards?
A. Got dressed, got [MP] up and got ready.
Q. And the three of you went to your appointment?
A. As far as I remember.
Q. Are you -- let's be clear. You did, in fact, delete some of those text messages. Right?
A. Yes.
Q. Did you delete it because he asked you to?
A. Yes. And --
Q. And why?
A. I was ashamed and embarrassed.
Q. Now, those remaining text messages, did you change them up? Did you manipulate them in any way -- doctor them up?
A. No, sir. It would say if I had or not.
Q. Okay. Did you falsify those texts, meaning did you use some type of an app or software or burner phone, or whatever, to send text messages that would have spoofed this -- JP'[s] phone?
A. No, sir.
Q. That would have mimicked his phone?
A. No, sir.
Q. Did you make this up because you were mad at your mother, Kristina?
A. No, sir.
Q. Did you make this up because you were mad at JP?[3]
A. No, sir.
Q. In fact, you weren't mad at JP at all, were you?
A. No, sir.

---

[3] PF called the defendant, Jarrett Paul Proctor, "JP."

12

The State initially rested its case after the testimony of PF.

7. Defense calls Simmons to Testify and Trial Court Admits Defense Exhibit #1

Proctor's defense attorney called Sergeant Kendra Simmons to testify. Sergeant Kendra Simmons testified that she is with the Hardin County Sheriffs' Office and that she was the lead investigator on the case. She attended the LIT police academy in Beaumont and has been trained in "criminal investigations, sexual assault investigations, [and] homicide investigations." She began her investigation in this case on January 14, 2024. She received an "outcry document[]" and then scheduled a forensic interview at the Garth House and a SANE exam, and she received some statements. During her investigation, Simmons learned that on the weekends PF lived with her mother and Proctor. Simmons testified that PF's biological father provided the cell phone to her after PF had given it to him. Simmons recalled that PF's cell phone was given to her at the Garth House during PF's forensic interview. Simmons testified that PF's biological father gave his consent to search PF's cell phone. Simmons stated that she was not aware that PF's biological father was not the "owner" of the cell phone and she did not obtain a warrant to search the cell phone, nor did she issue a subpoena for the cell phone's records or for records associated with Proctor's text messages because she "didn't feel like it was necessary[]" for this type of investigation.

After Simmons testified, the Defendant then introduced Defense Exhibit #1, the trial court admitted the exhibit, and the defense rested. The defense also made motions for directed verdicts relying in part on the Defense Exhibit #1, which were denied by the trial court. The Defendant stated on the record outside the presence of the jury that the defendant did not wish to testify in his own defense. After an adjournment, the jury returned and was seated.

8. State Reopens Case to Present Rebuttal Witnesses

Before the charge was read to the jury and before closing arguments, the State made a motion to reopen its case to offer rebuttal witnesses pertaining to the cell phone record which is Defense Exhibit #1. Proctor's defense attorney objected to the State's request to reopen its case and argued:

> [W]e anticipate one of these witnesses has been present for the entire trial and was subject to the rule. I understand this is rebuttal, but I need to make an objection to that, any witness that was not physically excused.

The trial court overruled the objection and stated the rebuttal witnesses would be allowed to testify "under the circumstances[.]" The State called two rebuttal witnesses, Alex Crank and Michele Revia.

Alex Crank was sworn in and the trial court noted that he had been present for the "entirety of the trial." Crank testified that he has a background in law enforcement and that he currently works for the Hardin County District Attorney's Office as an evidence technician, trial coordinator, and investigator. Crank testified

14

that the admitted phone records in Defendant's Exhibit #1 were from FirstNet, a subset of AT&T, and that Crank was also a FirstNet customer. Crank testified that he had received many bills or invoices from FirstNet. Investigator Crank testified that he was able to review those records and he also accessed his own FirstNet account. Crank stated:

> An hour ago, hour and a half ago, I logged into the system and attempted to locate a text record similar to what I had seen in evidence. I found what I believe to be a similar record. And in reviewing those, I noted that there were texts that were sent and received by me that were not reflected on the record that AT&T provided to me.

State's Exhibit #7 was admitted, which was Investigator Crank's phone record. Crank answered questions comparing Defense Exhibit #1 and State's Exhibit #7. Investigator Crank testified that there were known text messages between himself and his wife, for example, and also between himself and the State's Investigator Sadie Guidry, as another example, which were not reflected on his bill which is marked as State's Exhibit #7. In response to the missing information on State's Exhibit #7, Investigator Crank stated:

> I would say that now that I have my own personal experience, knowing that texts I sent and received are not reflected on the bill or on the downloaded text messages, I can't say -- I have my own personal experience that things I know occurred on that phone are not reflected on this. So I have to look at Defense Exhibit 1 with a different set of eyes now.

> Michele Revia was the State's second rebuttal witness. Defense counsel objected to Revia testifying as a witness:

15

This next witness was not on a witness list. I know and understand it's a rebuttal witness, but essentially she's being called to have the exact same testimony that the investigator just testified to, essentially, bolstering the same content. And I object to it because it wasn't provided. I have no information about this person at all to conduct cross-examination. And I don't feel comfortable doing it in realtime, so to speak. So I object to the testimony of this witness.

. . . .

[T]his witness has been sitting in that room with all these other witnesses, but she was not under the rule. So I object to the whole thing.

The trial court overruled the objection. Revia testified that PF is her great niece, and she had been in the court room to observe the trial. Revia also testified that AT&T is her phone carrier, and she understood that FirstNet is a subsidiary of AT&T. She testified about her knowledge of accessing, reviewing, and manipulating her own cell phone records:

Q. And please tell the jury about your experience with being able to go online and view certain records as it relates to your account.
A. To my personal account, I was able to go on and log into my account and pull up my data from my phone number and download text message[s], phone[], calls. Anything made, I can just pick them up, in the year, and download them.
Q. And in what format did it come up in?
A. You can choose. You can choose to download it onto your own computer as an Excel.
Q. Excel spreadsheet?
A. Correct. As a CSV -- or CVS format. And you can also print it directly from AT&T.
Q. Now, your experience with Excel spreadsheets, are they -- once you've downloaded it in that format, can it be manipulated; in other words, can the information be added or deleted?
A. I opened it all three ways that I could. I could manipulate those in the Excel and the CVS -- or I'm not sure which one it was, but I could manipulate -- I could go in and just select what I wanted to and delete it and hit print and it was gone. I just wanted to see if it could be done,

16

and I just did it. But the only way you could not manipulate it is if you printed it directly from the AT&T website.

## Analysis

In his first issue, Proctor argues that the trial court erred in admitting text messages extracted from a cell phone without a warrant, subpoena, or valid third-party consent, in violation of the constitutions of the United States and Texas as well as Texas law. Proctor did not make this objection at the time State's Exhibit #1 was offered into evidence during trial. When the evidence was offered and admitted, Proctor's objection was solely based on the alleged inability to "authenticate" the text messages. The trial court overruled Proctor's authentication objection and ruled that PF could authenticate the extracted messages through her testimony. During the trial, the only time Proctor made any argument pertaining to a possible constitutional issue was after both parties had rested and he asked for a jury instruction under article 38.23, which was also denied. On appeal Proctor does not argue that the trial court erred in refusing to grant the Defendant an instruction under article 38.23, so we do not discuss this any further.

A party must first present the trial court with a timely request, objection, or motion indicating the specific grounds for the desired ruling if those grounds are not apparent from context. Tex. R. App. P. 33.1(a)(1). The trial court must have either ruled on the request, objection, or motion, either expressly or implicitly, or, in the

absence of a ruling, the complaining party must have objected to the trial court's refusal to rule. Tex. R. App. P. 33.1(a)(2). The issue raised on appeal must also comport with the objection made at trial. *Jackson v. State*, Nos. 09-16-00492-CR & 09-16-00493-CR, 2017 Tex. App. LEXIS 5686, at *6 (Tex. App.—Beaumont June 21, 2017, no pet.) (mem. op., not designated for publication) (citing *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002)); *see also Swain v. State*, 181 S.W.3d 359, 367 (Tex. Crim. App. 2005). Even alleged constitutional errors may be waived. *See Jackson*, 2017 Tex. App. LEXIS 5686, at *6; (citing *Curry v. State*, 910 S.W.2d 490, 496 n.2 (Tex. Crim. App. 1995)). The alleged constitutional challenge as to how the State obtained the messages or the argument that the victim's father lacked authority to consent to allow the State to view and copy the messages onto the thumb drive were not timely made at trial nor preserved for review on appeal. *See Wilson*, 71 S.W.3d at 349; *Curry*, 910 S.W.2d at 496 n.2; *Jackson*, 2017 Tex. App. LEXIS 5686, at *6.

Even if Proctor had preserved his argument that the State violated Proctor's rights under the Fourth Amendment of the United States Constitution, Article 1 § 9 of the Texas Constitution, and Texas law because they failed to obtain a warrant or obtain his or his wife's authority to search the phone, we conclude his argument is unfounded.

There is no evidence in the record that PF's cell phone was owned by Proctor, nor does Proctor contend he used it or that he had any "legitimate expectation of privacy" as to the cell phone's content. The record shows that although Kristina Proctor (PF's mother) may have paid for the cell phone, Kristina gave the phone to PF to use, PF had a passcode for the cell phone, and PF gave that passcode to the investigators and she and her biological father gave permission for the messages and photos on the phone to be viewed. To challenge the constitutionality of a search, a defendant must have "a legitimate expectation of privacy in the place invaded." *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996) (plurality opinion). Absent a reasonable and legitimate expectation of privacy, a defendant lacks standing to raise a constitutional challenge like this, and we do not consider the substance of his complaint. *See King v. State*, 670 S.W.3d 653, 656 (Tex. Crim. App. 2023) (citing *Kothe v. State*, 152 S.W.3d 54, 59 (Tex. Crim. App. 2004)). The evidence here does not establish that Proctor had any reasonable or legitimate expectation of privacy in PF's cell phone. *See State v. Granville*, 423 S.W.3d 399, 409 (Tex. Crim. App. 2014) ("Although a person may have a reasonable and legitimate expectation of privacy in the contents of his cell phone, he may lose that expectation under some circumstances, such as if he abandons his cell phone, *lends it to others to use*, or gives his consent to its search." (emphasis added)); *Smith v. State*, No. 09-24-00198-CR, 2025 Tex. App. LEXIS 635, **11-17 (Tex. App.—

19

Beaumont 2025, no pet.) (mem. op., not designated for publication). (The Fourth Amendment was not implicated when the defendant gave the passwords to his girlfriend and allowed her to use his phone and computer and the girlfriend provided improper materials and images that she found to the State.); *Young v. State*, No. 05-09-00267-CR, 2010 Tex. App. LEXIS 9832, at **9-10 (Tex. App.—Dallas 2010, pet. ref'd) (not designated for publication) (adult female who had given a minor, not her son, a cell phone to use did not have an objectively reasonable expectation of privacy in the phone).

That said, to the extent the Appellant also argues on appeal that the trial court abused its discretion in making its ruling regarding the authentication of State's Exhibit #1, we agree that objection was preserved. Even so, for the reasons we explain below, we also reject Proctor's argument that the trial court erred in overruling his authentication objection and admitting the evidence. A trial court's admission of evidence is reviewed under an abuse of discretion standard. *Hanks v. State*, No. 09-23-00132-CR, 2024 Tex. App. LEXIS 6748, at **39-41 (Tex. App.—Beaumont Sept. 11, 2024, pet. ref'd) (mem. op., not designated for publication) (citing *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018)). An appellate court must uphold the trial court's admission of evidence if the ruling is within the zone of reasonable disagreement. *Id.* at *41. To authenticate evidence, the proponent of an item of evidence is required to produce evidence which is sufficient to support

the finding that the item of evidence is what the proponent claims it to be. Tex. R. Evid. 901(a).

Regarding authentication, ultimately it is the jury's role to determine whether an item of evidence is indeed what its proponent claims it to be, and the trial court need only make a preliminary determination that the proponent of the item has supplied facts which are sufficient to support a reasonable jury's determination that the proffered evidence is authentic. *Butler v. State*, 459 S.W.3d 595, 600 (Tex. Crim. App. 2015). Our review of a trial court's ruling on authentication is otherwise deferential. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012).

When PF testified regarding the text messages, she identified the messages and provided explanations of the use of emojis between Proctor and herself, as well as the details of the messages. "Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence." *Tienda*, 358 S.W.3d at 638. When authenticating an electronic communication, a witness qualifies as having knowledge of the communication when the witness participated in an exchange of messages and can testify to an exhibit's fair and accurate depiction of the messages exchanged. *See Hanks*, 2024 Tex. App. LEXIS 6748, at **43-44 (citing *Chavezcasarrubias v. State*, No. 02-14-00418-CR, 2015 Tex. App. LEXIS 10652, at **4-5 (Tex. App.—Fort Worth Oct. 15, 2015, no pet.)

21

(mem. op., not designated for publication) (citing Tex. R. Evid. 901(b)(1)); *Aekins v. State*, No. 04-13-00064-CR, 2013 Tex. App. LEXIS 13694, at **13-16 (Tex. App.—San Antonio Nov. 6, 2013) (mem. op., not designated for publication), *aff'd*, 447 S.W.3d 270 (Tex. Crim. App. 2014); *see also Peña v. State*, 467 S.W.3d 71, 75 (Tex. App.—San Antonio 2015, no pet.).

We conclude that the trial court could have reasonably made a preliminary determination that the State had supplied facts which were sufficient to support a reasonable jury's determination that the proffered evidence is authentic. The testimony from PF established the messages were between PF and Proctor, and PF testified that she participated in the exchange of the messages and was a person with personal knowledge of the messages under Rule 901. *See Hanks*, 2024 Tex. App. LEXIS 6748, at *45 (citing Tex. R. Evid. 901(a), (b)(1)). Detective Barboza also testified how he copied the text messages from PF's cell phone and created the flash drive that was used at trial. Additionally, the testimony of PF and Detective Barboza was sufficient to support a reasonable jury determination that the text messages were taken from PF's cell phone and were authentic. *Id.* (citing *Fowler*, 544 S.W.3d at 849). We overrule issue one.

In Proctor's second and third issues, he complains about the trial court allowing the State to reopen its case after resting because he contends that the rebuttal witnesses had been present during trial and were not excused under the Rule,

22

which had been invoked early in the trial, and because it was offered under the false assertion that the witnesses would be rebuttal witnesses, resulting in unfair prejudice to Proctor and denial of a fair trial.

We review a trial court's ruling on the exclusion or admission of witnesses under Texas Rule of Evidence 614 for an abuse of discretion. *See Russell v. State*, 155 S.W.3d 176, 179-80 (Tex. Crim. App. 2005). Similarly, we review a trial court's ruling on a motion to reopen a case for abuse of discretion. *See Peek v. State*, 106 S.W.3d 72, 79 (Tex. Crim. App. 2003); *Reeves v. State*, 113 S.W.3d 791, 794 (Tex. App.—Dallas 2003, no pet.). And the admissibility of testimony from rebuttal witnesses is also within the discretion of the trial court. *See Shield v. State*, 38 S.W.2d 76, 80 (Tex. Crim. 1931); *Jasso v. State*, 699 S.W.2d 658, 661 (Tex. App.— San Antonio 1985, no pet.). We assume such discretion was properly exercised unless an abuse of discretion is evident from the record. *Jasso*, 699 S.W.2d at 661.

Article 36.02 of the Texas Code of Criminal Procedure provides that the trial court "shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appears that it is necessary to a due administration of justice." Tex. Code Crim. Proc. Ann. art. 36.02. "'[D]ue administration of justice' means a judge should reopen the case if the evidence would materially change the case in the proponent's favor." *Peek*, 106 S.W.3d at 79. "While Article 36.02 mandates certain circumstances in which a trial court is required to reopen the

23

evidence before argument is concluded, it does not limit a trial court's discretion to reopen a case at any time before argument has concluded." *Davison v. State*, Nos. 09-22-00008-CR, 09-22-00009-CR, 09-22-00010-CR, 09-22-00011-CR, 09-22-00012-CR, 09-22-00013-CR, 09-22-00014-CR, 09-22-00015-CR, 09-22-00016-CR, & 09-22-00017-CR, 2022 Tex. App. LEXIS 7210, at **4-5 (Tex. App.—Beaumont Sept. 28, 2022, pet. ref'd) (mem. op., not designated for publication) (citing *Fury v. State*, 607 S.W.3d 866, 875 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd); *Swanner v. State*, 499 S.W.3d 916, 920 (Tex. App.—Houston [14th Dist.] 2016, no pet.)).

The record shows that the State moved to reopen the evidence prior to closing argument and after the defense had introduced Defense Exhibit #1, which the defense represented was a part of Kristina's cell phone bill. Before the State called its first rebuttal witness, the defense attorney made an objection stating each of the witnesses had been present during the trial and were not excluded during the testimony of other witnesses under the Rule. The defense did not make any argument about whether the rebuttal evidence was material or necessary for the due administration of justice.

With respect to the trial court's decision to allow the State to reopen the evidence and present testimony from the two rebuttal witnesses, we conclude the trial court did not abuse its discretion by allowing the State to reopen the evidence

24

after the State had rested but before closing arguments had commenced. *See Fury*, 607 S.W.3d at 875; *Swanner*, 499 S.W.3d at 920. The timing was such that it was within the trial court's sound discretion to reopen the case for the "due administration of justice." *See* Tex. Code Crim. Proc. Ann. art. 36.02; *Peek*, 106 S.W.3d at 79; *Fury*, 607 S.W.3d at 875; *Swanner*, 499 S.W.3d at 920; *Reeves*, 113 S.W.3d at 794.

As to Proctor's argument about a violation of Rule 614, we note that an alleged violation of Rule 614 does not result in automatic reversal. *Webb v. State*, 766 S.W.2d 236, 240 (Tex. Crim. App. 1989). Texas Rule of Evidence 614 provides that "at a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own." Tex. R. Evidence 614. The purpose of the Rule is to prevent witness corroboration, contradiction, and influencing. *Harris v. State*, 122 S.W.3d 871, 882 (Tex. App.—Fort Worth 2003, pet. ref'd.) (citing *Minor v. State*, 91 S.W.3d 824, 829 (Tex. App.—Fort Worth 2002, pet ref'd)).

In *Bell v. State*, 938 S.W.2d 35, 50 (Tex. Crim. App. 1996), the Court of Criminal Appeals noted that the Rule does not mention what sanctions, if any, a trial court should impose for violations of the Rule. The Court went on to explain that "[u]nlike the trial court's obligation to order witnesses excluded during other witnesses' testimony, the court's decision to allow testimony from a witness who has violated the rule is a discretionary matter." *Id.* Further, it has been held that the

trial court's ruling on an objection to a witness testifying when the witness has remained in the courtroom after having been placed under the "[R]ule" may not be relied upon as a ground for reversal unless an abuse of discretion is shown; and it will be presumed on appeal that such discretion was properly exercised until the contrary has been shown. *See id.* (citing *Valdez v. State*, 776 S.W.2d 162, 170 (Tex. Crim. App. 1989)). The "witnesses" contemplated by the Rule are those witnesses a party anticipates calling to testify. *See Tell v. State*, 908 S.W.2d 535, 540 (Tex. App.—Fort Worth 1995, no pet.).[4]

Appellate courts conduct a two-step analysis to determine whether a trial court has abused its discretion by allowing a witness to testify when that witness violated the Rule. *Harris*, 122 S.W.3d 871 at 882 (citing *Minor*, 91 S.W.3d at 829). We first determine what kind of witness was involved: (1) a person who was not intended to be called to testify and who was not connected to the case-in-chief but who has, due to events during trial, become a necessary witness; or (2) a person who had been sworn or listed as a witness in the case and either heard or discussed another's testimony. *Id.* (citing *Guerra v. State*, 771 S.W.2d 453, 476 (Tex. Crim. App. 1988),

---

[4] At the time that *Tell* and *Bell* were decided, the sequestration rule was known as Texas Rule of Criminal Evidence 613 and the discussion in each opinion references "Rule 613." On March 1, 1998, the criminal and civil rules of evidence were combined and the numbering was changed. The substance of the former Texas Rule of Criminal Evidence 613 is now part of "Tex. R. of Evid. 614." We refer to the witness sequestration rule as either the "Rule" or "Rule 614."

*cert. denied*, 492 U.S. 925 (1989)). Generally, an abuse of discretion for an alleged Rule 614 violation will not be found when the witness is someone the offering party had not anticipated would be called to testify as a witness. *Id.* (citing *Minor*, 91 S.W.3d at 829; *Phillips v. State*, 64 S.W.3d 458, 459-60 (Tex. App.—Houston [1st Dist.] 2001, no pet.)).

The State called Crank and Revia as rebuttal witnesses. The State stated on the record in this case that it had not anticipated calling either rebuttal witness when the trial court instructed prospective witnesses regarding the Rule, and the State noted it did not decide to call the rebuttal witnesses until the Defense offered and admitted Defense Exhibit #1. So, the witnesses in question did not fall within the category of witnesses any of the parties had anticipated would testify. During trial, Kristina testified that PF and Proctor did not exchange texts and that when she had monitored PF's phone, she had never seen any texts between PF and Proctor. There was some initial discussion outside the presence of the jury about Kristina's cell phone records, but none of the cell phone records were admitted into evidence at that time or at the time the State rested. The next day, during the Defense's case-in-chief, the Defense attorney offered what he represented was a true and accurate redacted part of Kristina's cell phone billing record, which he stated Kristina had downloaded from her cell phone provider to show what texts PF's phone had received. The document was admitted as Defense Exhibit #1, and the Defense rested. Even though

the State had initially stated it had no rebuttal witnesses, before the charge was read to the jury and before closing arguments, the State sought to reopen the evidence and offer testimony from Crank and Revia as rebuttal witnesses. The State did so because the rebuttal witnesses had the same cell phone carrier as Kristina, and each could provide testimony about the ability to see their own bill and text messages.

Crank testified that he was familiar with accessing and reviewing his phone's billing records. Crank explained that his billing records did not reflect all his text messages that he had exchanged with other individuals. Revia also testified regarding her knowledge of accessing and reviewing her phone's online billing records as well as being able to manipulate the billing record by selecting specific sections to be generated in a printout.

The record shows that neither Crank nor Revia participated as witnesses in the State's case-in-chief, nor did they have personal knowledge of the offense in question, so they were not likely to be called as a witness when the Rule was invoked. *Guerra*, 771 S.W.2d at 476. There is no abuse of discretion when this category of a witness is allowed to testify. *Id.*; *Webb*, 766 S.W.2d at 240; *see Harris*, 122 S.W.3d at 882. On this record, we cannot say the trial court abused its discretion in allowing the State to reopen and present testimony and evidence with the two rebuttal witnesses.

We overrule issues two and three.

28

Having overruled all of Proctor's issues in his appeals, we affirm the trial court's judgments.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on April 2, 2026
Opinion Delivered August 5, 2026
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.

29